CAIN v. ALLEN ELECTRIC & EQUIPMENT COMPANY.

1. MASTER AND SERVANT—BONUS FOR CONTINUOUS EMPLOYMENT.
An employer's offer of a bonus or additional compensation to employees who shall render continuous and efficient service for a specified period of time constitutes an offer to procure efficient and faithful service and continuous employment and becomes a supplementary contract of which the complying employee cannot be deprived without sufficient cause.

2. SAME—CONTRACTS—SEPARATION PAY.
Employer's written supervisory and office personnel policy, wherein it was stated that in "an endeavor to achieve fairness with due consideration for the feelings of the employees * * * when it becomes necessary to terminate the services of an office employee on a permanent basis, such individual will be paid separation pay" constituted an offer of a contract which plaintiff had accepted by continuing in the employ beyond the 5-year period specified in the termination pay policy, that was not within the employer's power to withdraw when called upon to perform.

REFERENCES FOR POINTS IN HEADNOTES
[1] 35 Am Jur, Master and Servant § 71.
[2] 35 Am Jur, Master and Servant § 80.
[3] 12 Am Jur, Contracts § 3.

3. CONTRACTS—DEFINITION OF A PROMISE.
   A promise is an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such manner to a promisee that he may justly expect performance and may reasonably rely thereon.

4. MASTER AND SERVANT—SEPARATION PAY—OFFER AND ACCEPTANCE.
   An employer's reservation of a right to change or amend its offer of separation pay to its employees could not encompass the denial of a contract right which had been gained by an employee through acceptance of the offer.

5. SAME—TERMINATION OF EMPLOYMENT.
   Employment of plaintiff employee was terminated by defendant corporate employer's president, where he was told his employment was terminated immediately, that he was never to return to work and was handed his final check and termination was not merely accelerated, where he was fired because he had submitted his resignation to become effective in the future.

Appeal from Kalamazoo; Fox (Raymond W.), J. Submitted April 6, 1956. (Docket No. 47, Calendar No. 46,694.) Decided September 4, 1956.

Action by Robert M. Cain against Allen Electric & Equipment Company, a Michigan corporation, for termination pay under company's announced personnel policy. Following earlier judgment and rehearing, summary judgment on stipulation of facts entered for plaintiff. Defendant appeals. Affirmed.

*Stratton, Wise, Sykes, Early & Starbuck,* for plaintiff.

*Sharpe, Stapleton, Huff & Adams,* for defendant.

SMITH, J. In this action the plaintiff, Robert M. Cain, a former employee of the defendant, Allen Electric & Equipment Company, seeks the recovery of severance pay from the defendant corporation. The cause was submitted upon stipulated facts.

Insofar as material to this appeal they disclose that plaintiff Cain was employed by the defendant in the capacity of chief engineer at a salary of $750 monthly. It is agreed that plaintiff's status of employment was that of an employee at will during the period here involved. On June 30, 1954, the defendant corporation adopted a "supervisory and office personnel policy." Its purpose clauses provided:

"It seems desirable that we set out in writing certain personnel policies for Allen. Of course such policies cannot be complete and are subject to change or amendments either through necessity created by laws or for other reasons that may come to our attention.

"The keynote of our policy as herein related is an endeavor to achieve fairness with due consideration for the feelings of the employees to whom this is directed, and will be of particular assistance to new or temporary employees. * * *

"It is the responsibility of every supervisor and employee to make these policies fully effective in the course of actual operations and to carry on the daily work of the organization in a spirit of cooperation and friendliness."

Among the numerous provisions of defendant's "personnel policy" was included a clause governing termination of employment. It provided that:

"When it becomes necessary to terminate the services of an office employee on a permanent basis, such individual will be paid separation pay [in?] lieu of notice as stated in table given to each employee now in the service of the company and will be presented to each new employee who enters upon the office payroll. The termination table referred to was adopted June 30, 1954. The amount of separation pay is governed by position held and length of service with this organization."

With respect to termination pay, a communication of defendant, directed to all office employees, informed them that:

"Recently, management approved a permanent personnel policy for termination pay and vacation pay. For your information, we have listed these 2 plans which apply only to office employees."

Following the above introductory paragraph, a "termination pay policy" was stated. The pertinent part thereof (insofar as this litigation is concerned) provided that an "executive" having 5 to 10 years employment should be entitled to 2 months termination pay. It is stipulated that plaintiff was classified as an "executive" employee and that he had knowledge of the personnel policies of the defendant corporation at the time they were "adopted and exhibited to" all its supervisory and office employees, including plaintiff.

On October 12, 1954, plaintiff Cain submitted to L. O. Zick, president of defendant corporation, his resignation. It read as follows:

"After careful deliberation and for personal reasons, I have decided to resign my position with this company, effective December 15, 1954.

"I wish to express my heartfelt best wishes to everyone at Allen and my sincere thanks for the kindnesses shown me during my employ."

Two days later, Mr. Zick, on behalf of the defendant, called plaintiff into his office and "told plaintiff that his employment was terminated effective immediately." It is agreed that plaintiff had no notice of termination of employment prior to October 14, 1954; that the "personnel policies" heretofore enumerated were then in effect and had been so since June 30, 1954; that plaintiff Cain was ready, willing and able to remain in defendant's employ until December 15, 1954 (the stated effective date of his

resignation) and that this was made known to Mr. Zick, "and others," but that plaintiff was prohibited from continuing his work after October 14th.

The defendant's board of directors, on October 23, 1954, passed a motion that no "severance pay" (this term is apparently used in the record and briefs as synonymous with "termination pay") be paid to plaintiff. No question is raised about unsatisfactory performance of work by the plaintiff, culminating in discharge. The incident that precipitated his discharge, "effective immediately," by Mr. Zick was his resignation. "The sole reason that the plaintiff's employment was terminated," it is agreed by both parties, "was because plaintiff had submitted his resignation effective December 15, 1954, as aforesaid."

Plaintiff's demand for severance pay, in lieu of notice, having been refused by defendant, this action followed. Upon answer filed, both plaintiff and defendant moved for summary judgment. The trial court, on May 3, 1955, decided the motions for summary judgment in favor of defendant. This was principally on the reasoning that the "termination provision" (of defendant's personnel policy) applied only to "situations where management terminates the services of an officer employee on a permanent basis," and that here the plaintiff had really removed himself from the pay roll by resignation, Mr. Zick's actions of October 14th merely "accelerating" such termination of employment.

Plaintiff moved for a rehearing upon the ground that the trial court had erred as a matter of law in granting defendant a summary judgment, and in finding that plaintiff had, in effect, permanently terminated his own employment. Reconsideration of the issues involved satisfied the trial court that it had erred in arriving at its former conclusion and plaintiff's motion for a rehearing was granted.

Upon rehearing the court found for plaintiff in the amount of $1,500, plus interest, this being the sum stipulated as proper recovery, should plaintiff prevail.

Defendant has appealed from the judgment entered below, and to us it briefs and argues 2 questions, namely, that the personnel policy, and termination pay plan, of defendant did not, together, constitute a legal offer (which could ripen into a contract upon plaintiff's acceptance thereof), and, second, that plaintiff's employment was not permanently terminated by defendant within the meaning of the alleged contract. Appellee accepts the questions involved. We will determine the issues in the order named.

The defendant, as noted, insists to us that its above-described declarations as to its personnel policies "were not of a promissory or contractual nature and did not constitute an offer capable of acceptance by appellee but were a mere gratuitous statement of policy or intention." It tells us that its personnel policy, with its talk of "achieving fairness," of paying termination pay in "lieu of notice," and of carrying on "the daily work of organization in a spirit of cooperation and friendliness," contained no suggestion of agreement, nothing of promise, no offer of any sort whereby word or deed on the part of the employee might ripen management's tendered words into a contract. The word to be stressed with respect to the personnel policy, we are told, is the word "policy" and this, it is said, is the language of philosophers, not of lawyers, or of those reaching a mutual agreement. (This word policy "is significant in that it is commonly used to refer to a basic philosophy or approach to given matters rather than to refer to something which is intended to rise to the stature of a legal offer.") There having been, then, no offer, there could have been no acceptance

and, hence, no contract. Such is defendant's theory.

Of recent years we have seen a good deal of this type of employer announcement, directed toward the establishment and maintenance of better employee relations. In some instances it has taken the form of voluntary insurance or pension plans (*e.g., Psutka* v. *Michigan Alkali Co.,* 274 Mich 318; *Meyerson* v. *New Idea Hosiery Co.,* 217 Ala 153 [115 S 94, 55 ALR 1231]), in others, voluntary schemes of dismissal compensation (*Hercules Powder Co.* v. *Brookfield,* 189 Va 531 [53 SE2d 804]), and in still others combinations of both, often with additional benefits of various kinds included. The orthodox infirmity asserted, either by a stockholder's suit on the ground that the contract is *ultra vires* the corporation, *Heinz* v. *National Bank of Commerce in St. Louis* (CCA), 237 F 942, 944, 952, or by the company itself in opposition to an employee's suit for the allegedly promised payment, is that a pure gift was involved and that the element of consideration is entirely missing.

Is it the fact that dismissal compensation is purely a gift? That there is no consideration to the company from the adoption and operation of such a plan? Hawkins' careful study (Dismissal Compensation, 1940, pp 25–27) indicates otherwise:

"Important as rewarding, compensating or relieving employees may be, dismissal compensation plans have been adopted because of certain advantages they afford the company. Dismissal payments have been made to maintain favorable public relations and to sustain plant morale. A company that directly serves the public and spends large sums in securing good will for its products does not want to jeopardize its high standing by abruptly dismissing large numbers of workers. As one firm put it: 'The company was proud of its reputation in the town and would do nothing to lose the community good will.' Others hoped, by treating present em-

ployees fairly, that in the future the best grade of employees would be attracted to their employment office. This desire to keep a good name has been called 'sound business—a wise policy in the long run.' It is based, in reality, on the belief that the public opposes abrupt slashes in the working force by well financed corporations which stand to make larger profits through a merger, consolidation of processes, or the introduction of new machinery. As dismissal plans become more widespread and common, the community pressure will increase in spite of financial instability. The company will not gain as much good will as previously, because the plan no longer has the novelty so essential for publicity.

"Dismissal compensation plans have been adopted in this country to bolster the morale both of the employees who are dismissed and those left on the job. Companies have testified that production has been maintained and spoilage actually reduced when employees have been notified that a plant was to close and that compensation was to be paid. An employee having received a generous payment on dismissal will less likely be a 'knocker' of the firm. But the morale and efficiency of those still employed is extremely important for the company. One large corporation claimed that it had spent millions on building a loyal, contented and efficient working force, and that it had to pay dismissal compensation, or it would lose on its earlier investment.

"Closely tied to this matter of morale of the working force, is the protection of the individual employee from dismissal because of the disfavor of his immediate supervisor. By putting the cost of dismissal compensation on the department which dismisses the workers, financial pressure is used to keep the number of dismissals at a low figure. The company gains by protecting itself with dismissal compensation from the actions of its supervisors which might stir up a general feeling of bitterness and uncertainty among the employees.

"Dismissal, compensation also makes it easier for reluctant supervisors to remove from the rolls certain misfits who may have been employed by the company for some years. Many firms reported that their personnel audits disclosed numerous cases of employees whose employment, because of declining efficiency, should have been terminated several years before the checkup. Dismissal compensation pays for the mistakes of personnel management and helps raise the level of efficiency of the force.

"In times of full production, the abrupt quitting of a worker may disrupt operating efficiency. By offering notice or small dismissal payments in return for requesting notice from the employees, the company tends to gain by having time to make adjustments in personnel.

"Among other advantages, which a few companies have noted, is the opportunity to withhold periodic payments from those who enter a business harmful to the company or who mutter too loudly about the policies of the firm. A few plans have been introduced to forestall agitation on technological unemployment, the passage of State laws on unemployment insurance, and the threat of union activity. Such cases are comparatively rare and their results are of doubtful value.

"Public opinion, the needs of the employees, and the desire for a permanent, loyal, and efficient working force have united in making dismissal compensation seem the proper course for a number of American companies. The policy of emulating successful industrial relations programs, first undertaken by a few progressive firms, has contributed greatly to the spread of the dismissal compensation movement."

The supreme court of Virginia had presented to it the question now before us, with respect to which it held as follows:

"The first and primary question presented is: Was the offer of dismissal pay a mere promise of a

gratuity revocable at will, or was it an offer in reasonably sufficient terms, the price or consideration to be. rendered therefor by the employees being their continued service with the defendant until laid off by shutdown or reduction of forces?

"Defendant claims that the underlying motive and purpose of the plan was to cushion the shock of unemployment and ease the hardship upon employees incident to obtaining and removing to a new place of employment. It is insisted that the language used clearly indicates a reserved right to discontinue or change the plan at any time prior to termination of an employee's services. Bluntly stated, the defendant asserts that no offer was made and therefore none could be accepted by any employee, notwithstanding how faithfully and fully he complied with any and all conditions to merit the promised compensation.

"There is ample evidence, both documentary and oral, to support plaintiff's contention that the offer to pay dismissal salary and wage was not solely to cushion the shock of unemployment but a material reason therefor was to secure and retain the services of competent employees under difficult and critical labor conditions then obtaining.

"The evidence discloses that a considerable force was maintained solely to recruit employees and prevail upon them to continue working at the plants.

"Plaintiff insists that the offer or promise made by defendant that payment of dismissal wage or salary would be made was contained in reasonably sufficient terms and the consideration to be rendered by an employee was his continued satisfactory service with the company for the period or periods mentioned in the offer. Performance of the condition imposed, he asserts, is a full and complete acceptance of the offer.

"With this we agree. Through and by compliance with the terms of the offer, plaintiff necessarily had to and did forego his right to seek and accept other employment and affirmatively met all conditions im-

posed by rendering service to the defendant for the period and until the specified time." *Hercules Powder Co.* v. *Brookfield, supra,* 540, 541.

The North Carolina court has expressed itself likewise in the case of *Roberts* v. *Mays Mills,* 184 NC 406, 410 (114 SE 530, 28 ALR 338):

"It has become a very general policy with large employers of labor to offer a bonus or additional compensation to employees who shall render continuous and efficient service for a specified period of time. This is not a gratuity or gift, but is an offer on the part of the employer, with whom the offer originates in order to procure efficient and faithful service and continuous employment, and when the employee enters upon the service upon that inducement it becomes a supplementary contract of which he cannot be deprived without sufficient cause."

A similar argument was made in *Schofield* v. *Zion's Co-op Mercantile Institution,* 85 Utah 281, 286 (39 P2d 342, 96 ALR 1083), with respect to right of action on a voluntary pension plan:

"Appellant takes the position that the pension system constituted, not a contractual relationship, but a mere offer by the company of a gratuity to its employees, in which the employee could obtain no vested right; that the pension system does not constitute an offer which is subject to acceptance by the employee so as to create a contract. It may be conceded that the system is not such an offer as may be made into a binding contract by merely verbal acceptance, nor by the act of the party in entering the services of the institution."

The argument was rejected by the court in the following words (p 288):

"Clearly, such facts, circumstances, and history do not evidence an offer of a gratuity, but an offer to pay certain sums when plaintiffs shall have com-

pletely performed a certain set of acts, offered as an inducement to them to perform the acts, and given as a consideration for their complete performance. When the plaintiffs had completely performed their obligations and the board of pensions had determined their right to pension, made allowance thereof, and retired them, the contract was complete and binding, and not subject to modification by the company without consent of plaintiffs."

We cannot agree that all we have here is a mere gratuity, to be given, or to be withheld, as whim or caprice might move the employer. An offer was made, not merely a hope or intention expressed. The words on their face looked to an agreement, an assent. The cooperation desired was to be mutual. Did the offer consist of a promise? "A promise is an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such manner to a promisee that he may justly expect performance and may reasonably rely thereon." (1 Corbin on Contracts, § 13.) The essence of the announcement was precisely that the company would conduct itself in a certain way with the stated objective of achieving fairness, and we would be reluctant to hold under such circumstances that an employee might not reasonably rely on the expression made and conduct himself accordingly. As for consideration, that element setting apart the enforceable from the unenforceable, we hazard no definition. Suffice in this respect, upon the authority of a multitude of cases, to point out that not only were there rewards to the employee, but, in addition, substantial rewards to the employer, arising, in part, out of the accomplishment of "the daily work of the organization in a spirit of cooperation and friendliness." In short, the adoption of the described policies by the company constituted an offer of a contract. This

offer, as the trial court correctly held, "the plaintiff accepted * * * by continuing in its employment beyond the 5-year period specified in exhibit B (the termination pay policy)." The offer having thus been accepted it was not within defendant's power to withdraw it when called upon to perform. The "change or amendment" to which the company policy was said, in its preamble, to be subject, could not encompass denial of a contract right gained through acceptance of an offer. To assert otherwise is simply to re-assert that there was no contract.

By whom was the employer-employee relationship terminated upon October 14, 1954? We will turn to the stipulation of facts for answer. "Mr. L. O. Zick, president of defendant, acting on its behalf, called plaintiff into his office and told plaintiff that his employment was terminated, effective immediately, and that he was never to return to work, and he thereupon handed plaintiff his final check." Bluntly put, he was fired because he had submitted his resignation to take effect in future. To argue that defendant merely "accelerated" plaintiff's departure confuses the actual termination with the reason therefor.

Affirmed. Costs to appellee.

DETHMERS, C. J., and SHARPE, BOYLES, KELLY, CARR, and BLACK, JJ., concurred.

EDWARDS, J., took no part in the decision of this case.