## Richmond

## DULANY FOODS, INC.

### v.

## C. M. AYERS, ET AL.

November 21, 1979.

Record No. 771492.

Present: All the Justices.

*Baxley T. Tankard* for appellant.
*William E. Rachels, Jr. (James C. Howell; Willcox, Savage, Lawrence, Dickson & Spindle, P.C.,* on brief), for appellees.

HARRISON, J., delivered the opinion of the Court.

C. M. Ayers and 120 other former employees of Dulany Foods, Inc., filed their motion for judgment against Dulany, collectively seeking severance benefits. Following a three-day trial, the lower court, sitting without a jury, entered in favor of the plaintiffs 107 separate judgments in varying amounts totaling $138,765.22. Dulany has appealed, alleging that its offer of severance pay was purely gratuitous and was not capable of being accepted so as to form a binding contract; that the individual plaintiffs did not rely upon it in continuing in the employment of the defendant; and that assuming the court correctly awarded judgments for severance pay, the amounts awarded should have been limited to the number of years the plaintiffs were employed by the defendant and its affiliate corporations.

Dulany Foods, Inc., owned and operated a frozen food complex which included a sales office in Salisbury, Maryland, and frozen food plants in Bridgeville, Delaware, and Exmore, Virginia, as well as a farming operation at Exmore. In early December 1974, its Board of Directors decided to close these operations. J. J. Whittington, Jr., Dulany's Vice-President of Operations, testified that he informed the Bridgeville plant employees on December 3, 1974, that the plant

would close on December 31, 1974. Whittington stated that at the direction of C. D. MacCormack, President of Dulany, he also told the workmen that they would receive severance or termination pay. All but one of the Bridgeville employees who were actually terminated subsequently received the promised benefits.

On December 13, 1974, MacCormack, together with J. O. Tankersley, Chairman of the Board of Dulany, announced at a called meeting of the Exmore plant employees that the Exmore plant would close on February 28, 1975. Tankersley told the employees that his company wanted to keep them at work if possible and that "[i]f the plant can be kept into operation and keep you people at work, it could be for sale."

Following the closing of the Bridgeville plant, the employees at Dulany's Exmore plant learned of the severance benefits that were being given to the Bridgeville employees and began to inquire of Whittington as to their severance pay. Whittington testified that during this time he talked with MacCormack on numerous occasions about the severance payments to be made to the Exmore employees. After these discussions with his superior, Whittington prepared a memorandum for MacCormack, dated January 28, 1975, which represented Whittington's inquiry about and understanding of the severance pay policy that had been established by Dulany. This memorandum was delivered on January 29, 1975, to MacCormack, who remarked to Calvin M. Parks, the company's Secretary-Treasurer and Comptroller, "I can't see how you can close by February 28th. You have got repacking and we will pay severance as they [the employees] leave." [1] Then, in his own handwriting, MacCormack added a final sentence. The memorandum reads as follows:

DULANY FOODS DIVISION
UNITED FOODS, INC.

Date: January 28, 1975

TO: C. D. MacCormack
FROM: J. J. Whittington  /s/ JJW
SUBJECT: Guide Lines for Termination Pay for Exmore Plant
and Salisbury Sales Office Employees.

The following sets forth the guide lines as I understand them from our conversation:

---

[1] The repacking referred to by MacCormack is a process by which frozen foods are transferred from large storage containers to the actual containers sold to customers.

1. Termination pay is to be paid to salary and hourly workers who are on the payroll as of January 26, 1975.
2. People who are working as of January 26, 1975, but leave for another job prior to February 28, 1975, are eligible for termination pay.
3. Termination pay to be based as follows:

Up to five (5) years' service receive one (1) months' termination pay.

Five to ten (5-10) years' service receive two (2) months' termination pay.

Ten (10) years' and over service receive three (3) month's termination pay. All eligible are to be compensated for earned vacation pay which has not been used.

All termination pay should be due and payable as of February 28, 1975.

People remaining on payroll after 2/28/75 as needed will receive termination benefits on actual termination.[2]

JJW:cm                      /s/ C. D. MacCormack, Jr.
copy: CMP                        1/29/75
      MF

Dulany operated its Exmore plant beyond February 28, 1975, reassigning many of the employees to the repacking operation. During this time negotiations were under way for a sale of the plant. The defendant closed the Exmore facility on or about March 31, 1975, and dismissed all employees who had not previously been terminated. On April 1, 1975, Exmore Foods, Inc., leased the plant and equipment and continued operation. On July 9, 1975, Exmore Foods, Inc., exercised its option to purchase the Exmore plant from defendant for $687,107.90.

The plaintiffs involved here were employees of Dulany and all have been denied their severance pay. Dulany's position is that it exacted no promise or act on the part of the plaintiffs in exchange for the company's declaration of its intention to award termination pay; that neither continued nor satisfactory service with the company was required; and that any employee of Dulany could have left at any time for another job and still have remained eligible for severance pay. In substance, Dulany argues that the representations made by its officials, and the written memorandum, were merely voluntary promises of a gratuity, revocable at will, from which Dulany received no benefit, and the plaintiffs suffered no detriment.

---

[2] This sentence was added by MacCormack.

■ In support of this position Dulany cites Restatement of Contracts, § 24, which provides: "An offer is a promise which is in its terms conditioned upon an act, forebearance or return promise being given in exchange for the promise or its performance." *See also* Williston on Contracts § 25 (3rd ed. 1957). It distinguishes *Hercules Powder Co.* v. *Brookfield*, 189 Va. 531, 53 S.E.2d 804 (1949), upon the ground that "continuous service" was not required by Dulany as the consideration to be paid for eligibility for termination pay.

In *Hercules* the government's contracting officer had approved a dismissal wage and salary plan for the employer, following a representation by the employer that approval of the plan would "help in the recruit [*sic*] of labor, is essential in holding employees on war work during this critical period, and will serve as a means of achieving an orderly plant shutdown." 189 Va. at 536, 53 S.E.2d at 806. At the end of the war the plant was turned back to the Corps of Engineers. Hercules advised its employees that those who were transferred directly to the personnel of the Corps would receive no dismissal wages. When Brookfield, who was so transferred, was refused dismissal wages he instituted suit. This court, in deciding that Brookfield was entitled to recover, said:

> The first and primary question presented is: Was the offer of dismissal pay a mere promise of a gratuity revocable at will, or was it an offer in reasonably sufficient terms, the price of consideration to be rendered therefor by the employees being their continued service with the defendant until laid off by shutdown or reduction of forces?
>
> \*　　\*　　\*
>
> There is ample evidence, both documentary and oral, to support plaintiff's contention that the offer to pay dismissal salary and wage was not solely to cushion the shock of unemployment but a material reason therefor was to secure and retain the services of competent employees under difficult and critical labor conditions then obtaining.

189 Va. at 540, 53 S.E.2d at 808.

We observe that the memorandum, prepared by Whittington and amended and approved by MacCormack, was not executed in a vacuum. It was what these officials of the company understood to be the severance pay policy that had been established by Dulany. That policy was then in force, and under it Dulany had paid severance benefits to the employees of its Bridgeville, Delaware plant which

was closed during December 1974. The employees working at the Exmore plant knew about the severance benefits that had been paid to the Bridgeville employees, and it was their restlessness that prompted Whittington's memorandum.

The decision by Dulany to close its Eastern Shore plants and facilities was a major one for both management and employees. The livelihoods of a great number of employees in Virginia, Maryland, and Delaware were involved, and the owners had at stake a large investment in plants, equipment, and unsold food. The four months between the decision to close the plants and the time the Exmore facilities were taken over by Exmore Foods, Inc., were critical months for Dulany. Not only did the company have an unpleasant decision to make, implement, and communicate to its employees, it also had "to wind down" a vast manufacturing and refrigeration plant, an operation which included the repacking and refrigeration of millions of pounds of vegetables. Dulany needed the continued services of loyal and efficient employees to perform this task. It was vital to the company that its closing-out period be a peaceful one, and that favorable public relations and plant morale be maintained. These objectives were accomplished. The plant continued to operate in an orderly fashion beyond the original February 28, 1975 deadline, and on April 1, 1975, Dulany surrendered the plant to Exmore Foods, Inc., as a going concern with a well-trained group of employees. It is worth noting that Dulany suffered no interruption in service or damage to property from the time it announced to its employees its policy providing for severance pay until the day it closed. The company's termination pay policy brought it industrial peace, avoidance of unrest on the part of its employees, and consequently a smooth termination of operations.

During the four-month span involved in this case Dulany was actively seeking a buyer for its plants. It is a matter of common knowledge that the most valuable attraction a manufacturing plant can offer a prospective purchaser is a well-trained, efficient, loyal, and contented group of employees. Dulany possessed this intangible asset, and it is reasonable to believe that it was a factor in the willingness of Exmore Foods, Inc., to purchase the plant. It is equally as reasonable to attribute the good will of the employees to the severance pay policy that was inaugurated by Dulany.

Dulany's guidelines for severance pay were clear, definite, and unambiguous. Clause 1 thereof identified the employees of the company eligible to receive severance pay. This provision eliminated from eligibility persons who were employed temporarily by the company sub-

sequent to January 26, 1975, and during Dulany's closing operations. Clause 2 of the memorandum and MacCormack's addition were designed to fix the time at which severance pay was due its employees. Further, the effect was also to divide into two categories the employees identified in Clause 1: (A) Working employees who left their job at Dulany and accepted other employment prior to February 28, 1975, were to receive their severance pay on February 28, 1975; and (B) Working employees who did not accept other employment and continued working for the company were to receive their severance benefits on the date of the actual termination. Clause 3 of the memorandum provided the amount of termination pay.

It is apparent from the memorandum and the testimony in the case that Dulany intended to continue operations well beyond February 28, 1975. In fact, the genesis of MacCormack's addition to the memorandum is reflected in his remark to Calvin M. Parks that it was impossible to close the plant by February 28th. It is also clear from the testimony that Dulany needed and used a large number of its employees incident to closing its plant. The company, through Whittington, "assured them [employees] they would get this severance pay *to try and keep* them because they were very necessary in the operation." (Emphasis added.) Significantly, all the plaintiffs involved here continued in the employ of Dulany until their services were terminated by the company. This is understandable. The entire thrust of the memorandum and the tenor of representations by company officials were designed to induce and encourage the employees to stay on the job.

The fact that its employees, identified as those on the January 26, 1975 payroll, could leave for another job prior to February 28, 1975, and still be entitled to severance pay is not material, and neither is it material whether they continued to work because they relied upon the promise of severance pay. In *Hercules Powder Co.* v. *Brookfield, supra,* it was settled that because severance pay is a matter of contract between the parties, the question of reliance is not significant. We said: "Ample authority sustains the view that such a promise amounts to an offer, which, if accepted by performance of the service, fulfills the legal requirements of a contract. . . ." 189 Va. at 541, 53 S.E.2d at 808. *See also Martin* v. *Mann Merchandising, Inc.,* 570 S.W.2d 208 (Tex. Ct. App. 1978).

In *Cain* v. *Allen Electric & Equipment Co.,* 346 Mich. 568, 78 N.W.2d 296 (1956), the court held that an employer's adoption of a personnel policy relating to severance pay constituted an offer which was accepted by an employee when he continued working for the

company, and that the employee was entitled to severance pay upon termination of employment. The employer there, as Dulany here, defended upon the ground that its policy and offer constituted a gratuity. The court held:

> We cannot agree that all we have here is a mere gratuity, to be given, or to be withheld, as whim or caprice might move the employer. An offer was made, not merely a hope or intention expressed. The words on their face looked to an agreement, an assent. The co-operation desired was to be mutual. Did the offer consist of a promise? "A promise is an expression of intention that the promisor will conduct himself in a specified way or bring about a specified result in the future, communicated in such manner to a promisee that he may justly expect performance and may reasonably rely thereon." (Corbin on Contracts, § 13). The essence of the announcement was precisely that the company would conduct itself in a certain way with the stated objective of achieving fairness, and we would be reluctant to hold under such circumstances that an employee might not reasonably rely on the expression made and conduct himself accordingly. . . .

346 Mich. at 579, 78 N.W.2d at 301. *Accord, Twohy* v. *Harris,* 194 Va. 69, 72 S.E.2d 329 (1952).

■ *Anthony* v. *Jersey Central Power & Light Co.,* 51 N.J. Super. 139, 143 A.2d 762 (1958), concerned an action by former employees of a company to recover severance pay. The court held that it was immaterial to the employer's liability that employment had commenced prior to the announcement of a severance pay plan and that employees might have continued in its employment even in the absence of offer of severance pay. As in the instant case, the employer argued that the employees undertook no new obligations nor were they required to forego any rights or privileges in return for the company's promise, and were free to quit at will. The court said:

> It is unreal to contend that the employer received no benefit from the employees in return for the promise sued on. Many courts have recognized that, like other of the so-called "fringe benefits," the availability of severance pay tends to better employee morale, improve performance and lessen turnover, all to the distinct advantage of the employer. . . . The employer was not gearing its plan to tangible, measurable bettered performance by employees as individuals but to the amelioration of the con-

ditions mentioned for the employer's benefit on a mass or plant basis. It is to be presumed that the employer's objectives were realized and that the services of all the employees, collectively, contributed thereto. There was, therefore, both benefit to the employer and detriment to the employees. But *either alone would have been sufficient* if intended by the promisor as the price of his agreement. . . . [Emphasis added and citations omitted.]

\* \* \*

It makes no difference that the severance pay plan was promulgated after the plaintiffs had been employed for some time by defendant. Since the employment was always at will, any announcement of a change in or addition to the compensation of the employees of any form followed by the continuance of the employees in employment constituted an effective and binding agreement at the new terms for the service rendered thereafter. Consequently, once defendant improved the terms of compensation for plaintiffs' work by announcing the institution of the severance pay plan it must be assumed that plaintiffs were thereafter working for that benefit as much as for any other benefit or item of compensation held out to them as compensation by the employer.

51 N.J. Super. at 144-46, 143 A.2d at 764-66. *Accord, Dangott* v. *ASG Industries, Inc.,* 558 P.2d 379 (Okla. 1976).

■ Concerning adequacy of consideration, it was held in *Brewer* v. *Bank of Danville,* 202 Va. 807, 815, 120 S.E.2d 273, 279 (1961):

Consideration is, in effect, the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made. It matters not to what extent the promisor is benefited or how little the promisee may give for the promise. A very slight advantage to the one party or a trifling inconvenience to the other is generally held sufficient to support the promise.

*See also* 4B M.J. *Contracts* § 33 (repl. 1974).

■ Although many of the plaintiffs here were transferred directly to the payroll of Exmore Foods, Inc., with no loss of income, this does not affect their entitlement to severance pay from Dulany. *Adams* v. *Jersey Central Power & Light Co.,* 36 N.J. Super. 53, 114 A.2d 776 (1955), *aff'd,* 21 N.J. 8, 120 A.2d 737 (1956), held that

it was immaterial in a case involving severance pay that there was no loss of employment and no loss of income. The court commented that severance pay was never intended to be a substitute for unemployment compensation, and that severance pay plans greatly contribute to the maintenance of the good will of the employees and the community generally. *See also Gaydos* v. *White Motor Corp.,* 54 Mich. App. 143, 220 N.W.2d 697 (1974), and *Willets* v. *Emhart Manufacturing Co.,* 152 Conn. 487, 208 A.2d 546 (1965).

■ The memorandum in controversy was authored by Dulany's Vice-President, Whittington, and he testified, "I had knowledge of the [company's] formula [for severance pay] long before I wrote the memorandum. . . ." We therefore know that "long" before January 28, 1975, Dulany had adopted a severance pay policy and plan and that it had made severance payments thereunder to its Bridgeville employees when it closed the Delaware plant. Additionally, we know that pursuant to this plan, and in compliance therewith, Dulany made severance payments to its Salisbury, Maryland employees, and to a number of its employees at the Exmore, Virginia plant. We are dealing here with a company severance pay plan adopted as a part of company policy which ripened into a legally enforceable promise. Selective payments thereunder by Dulany to some employees and not to others equally entitled thereto cannot be permitted.

■ In *Chinn* v. *China National Aviation Corp.,* 138 Cal. App.2d 98, 99-100, 291 P.2d 91, 92 (1955), it was noted that in recent years the attitude of the courts, as well as of employees generally, is to consider a severance pay plan not a mere offer of a gift, but a unilateral contract offer which is accepted "if the employee continues in the employment."

Every plaintiff in this case was on Dulany's payroll as of January 26, 1975, and all continued in the employment of the company after being advised of its severance pay plan and after having knowledge of the Whittington-MacCormack memorandum. We find no error in the action of the trial court in deciding that these employees of Dulany Foods, Inc., the plaintiffs herein, are entitled to recover severance payments due them by the defendant.

■ We now consider defendant's assignment of error which questions the trial court's refusal to limit the "years of service," on which the judgments for severance pay were based, to those years during which the plaintiffs were employed by Dulany Foods, Inc., or its affiliates.

Since the food processing plant was established at Exmore, the plant has passed through the hands of several corporate owners. At

one time it was owned by Green Giant, from which it was acquired by United Foods, Inc. United Foods, Inc., is the parent company of Winter Garden, Inc., which owns all the stock of Dulany Foods, Inc. This corporate structure was in control of the Exmore plant for approximately ten years. Were we to hold that Dulany Foods, Inc., is liable for severance pay only for those years during which it owned the plant, the recovery of any employee would be limited to a maximum of two months severance pay. However, the testimony established that since its acquisition of the Exmore plant, Dulany Foods, Inc., used its employees' total years of service at the Exmore facility in computing vacation eligibility and seniority based compensation, and also in making various award presentations. Further, when Dulany Foods, Inc., memorialized the severance pay guidelines to be used at the Exmore plant and the Salisbury sales office, it ignored the fact that the facilities had been operated by Dulany Foods, Inc., for only ten years and specifically provided a category for those who had ten years *and over* of service.

Significant also is the fact that the same list that was used by the company to compute severance pay due the plaintiffs was used to determine vacation pay. In each instance the calculations were made on the basis of total years of service at the Exmore plant, not total years of service to Dulany Foods, Inc. In fact, J. O. Tankersley testified that employee vacation pay approved by him had in the past been computed on the basis of plant seniority. The Salisbury employees were paid on the basis of their total years of service, and in accordance with the guidelines which the Exmore employees claim represent the company's severance pay policy and should govern their payments. We agree.

Accordingly, the judgments of the lower court are

*Affirmed.*

POFF, J., dissenting.

I share the majority's sympathy for the plaintiffs. But, for two reasons, I cannot endorse their *ratio decidendi*. First, there was no contract; second, Dulany's promise of severance pay was not otherwise legally enforceable.

As hornbook law teaches, the three essential elements of a contract are an offer, an acceptance, and consideration.* Unlike a

---

* Sometimes a promise is legally enforceable despite the absence of one or more of these three elements, Restatement (Second) of Contracts §§ 7, 19, and 86-94 (Tent. Drafts Nos. 1-7, 1973), and the rubric "contract" is often applied to such special cases.

gratuitous promise, an offer (usually, but not always, a promise) is a manifestation of a willingness to enter into a bargain. Restatement (Second) of Contracts § 24 (Tent. Drafts Nos. 1-7, 1973). An offer identifies the bargained for exchange, *id.*, Comment b, and creates a power of acceptance in the offeree, *id.* § 28(1). *See Richmond Eng. Corp.* v. *Loth,* 135 Va. 110, 153, 115 S.E. 774, 786 (1923). Unless bargained for, a benefit the offeree confers upon the offeror cannot constitute consideration. Restatement (Second) of Contracts §§ 75 and 84 and Comments thereto (Tent. Drafts Nos. 1-7, 1973). Applying these principles to the facts at bar, I find that there was no offer, that there could have been no acceptance, and that the benefit Dulany received did not constitute consideration.

At most, Dulany's memorandum of January 28, 1975, was a promise to grant severance benefits to employees on the payroll January 26, 1975. An employee who quit work on January 27 was as much entitled to the promised payment as one who remained at work until Dulany ceased operating the plant. The memorandum was a promise to pay for work already performed; it was not a manifestation of a willingness to enter into a bargain for continued services. Nor did it create a power of acceptance; the employees could do nothing they had not already done to bind the promisor to perform the promise. While their continued services may have benefitted Dulany, the benefit did not constitute consideration because those services had not been bargained for.

*Hercules Powder Co.* v. *Brookfield,* 189 Va. 531, 53 S.E.2d 804 (1949), does not support the conclusion the majority reaches. Indeed, it affirms the principles of contract law I would apply. Hercules published a plan for payment of dismissal wages to employees, provided they continued to furnish satisfactory services for a stated period of time. This Court held, in effect, that the plan constituted an offer, which identified the exchange bargained for and created a power of acceptance in the offerees, and that Brookfield, by furnishing such services and forgoing the right to seek other employment, accepted the offer and furnished the consideration necessary to the formation of a contract. Moreover, the cases from sister states cited by the majority are similar to *Hercules;* in each, an employee continued to work after publication of a plan making continued service a condition precedent to eligibility for severance benefits.

Though a contract, in the traditional sense, does not exist, a promise may yet be legally enforceable. To avert inequity, some

courts have applied the doctrine that a promisor may, under certain circumstances, be estopped to breach his promise.

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

Restatement (Second) of Contracts § 90(1) (Tent. Drafts Nos. 1-7, 1973); *see also* Restatement of Contracts § 90 (1932). So stated, the doctrine of promissory estoppel has three elements: (1) the promisor should reasonably expect his promise to induce action or forbearance by the promisee, (2) the promise does induce such action or forbearance, and (3) enforcement of the promise is necessary to avoid injustice to the promisee. Promissory estoppel, like estoppel *in pais,* is an equitable device invoked to prevent a person from being injured by a change in position made in reasonable reliance on another's conduct. *See Cochran* v. *Ollis Creek Coal Co.,* 206 S.E.2d 410, 414 (W. Va. 1974).

This Court has never expressly applied this doctrine. Even if it were viable in Virginia and could be asserted offensively in an action at law, it would not aid the plaintiffs here. At least one of its three elements is missing. Although continued service was not a condition of the promise, I assume *arguendo* that Dulany should have expected its promise to induce its employees to continue working at the Exmore plant and that this promise did, in fact, induce most of the plaintiffs to do so. (Some testified that the promise was not an inducement.) While this was a benefit to Dulany, the plaintiffs have not shown that they suffered any detriment by relying on Dulany's promise. Rather, the contrary appears. If the ongoing operation at the plant benefitted Dulany by making the plant more attractive to potential buyers, the employees also benefited by obtaining a new employer. Thus, enforcement of Dulany's promise is not necessary to avoid injustice to the plaintiffs, and, absent this element, the doctrine of promissory estoppel does not apply.

I would reverse the judgments for the plaintiffs and enter final judgment for Dulany.

COCHRAN, J., joins in dissent.