**Sharon Yvonne HOLLAND, Plaintiff,**

v.

**EARL G. GRAVES PUBLISHING CO., INC., Defendant.**

No. CIV.A. 97–40083.

United States District Court,
E.D. Michigan.
Southern Division.

Aug. 5, 1998.

See also, 33 F.Supp.2d 581.

Randall J. Gillary, Randall J. Gillary, P.C., Troy, for Sharon Yvonne Holland, plaintiffs.

Randolph D. Phifer, Eugene M. Holmes, Patterson, Phifer, Detroit, for Earl G. Graves Publishing Company, Incorporated, defendants.

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

On September 19, 1997, plaintiff Sharon Yvonne Holland filed the instant three-count action against her former employer, Earl G. Graves Publishing Co., Inc. alleging breach of contract (Count I) and violations of the Michigan Sales Commission Act, M.C.L.A. § 600.2961 (Counts II and III). Subject-matter jurisdiction is premised upon 28 U.S.C. § 1332, diversity of citizenship.

Previously, both parties filed motions for summary judgment on Counts I and III.[1] In a memorandum opinion and order dated May 6, 1998, this court denied both parties' motions for summary judgment on Count I without prejudice, denied plaintiffs' motion for summary judgment on Count III and granted defendant's motion for summary judgment on the same.

Presently before the court is plaintiff's renewed motion for summary judgment on Count I. For the following reasons that motion will be granted.

### FACTS

The facts were fully set forth in this court's May 6, 1998 opinion and order. Nevertheless, this court once again will provide a full recitation to aid in the understanding of this opinion and order.

By letter dated February 19, 1992, defendant Earl G. Graves Publishing Company, Incorporated, the publisher of *Black Enterprise* magazine, extended an offer of employment to plaintiff Sharon Holland. On or about March 2, 1992, plaintiff commenced employment as an at-will employee in the position of Account Executive in defendant's Chicago, Illinois office. She was promoted to Senior Account Executive on or about July 1, 1994.

While employed by the defendant, plaintiff's principal job responsibility was to obtain advertising accounts for *Black Enterprise*. Plaintiff spent a substantial portion of her time each year in Michigan calling on automotive customers in the Detroit area, and in particular General Motors Corporation ("GM").

At the beginning of each fiscal year,[2] defendant provided plaintiff with a compensation package. The compensation package for the 1994/1995 fiscal year is at issue here.

The 1994/1995 compensation package was 12 pages (excluding the cover page), and set forth in detail how plaintiff was to be compensated for the year. Pursuant to the 1994/1995 compensation package, plaintiff was to be paid a base salary of $50,000, and she was eligible to earn monthly commissions dependent upon the revenues she generated. In addition to a base salary and monthly commissions, the 1994/1995 compensation package afforded plaintiff an opportunity to earn a "fiscal year end volume incentive award" (a.k.a. "year end bonus") if her actual net revenue dollars for the year exceeded her annual net revenue dollar quota. The schedule for calculating plaintiff's year-end bonus was depicted in the 1994/1995 compensation package as follows:

| Percentage Above Annual Net Revenue Quota | % Payout |
| --- | --- |

---

1. Count II was settled by the parties.

2. The defendant's fiscal year runs from August 1 through July 31.

| | |
|---|---|
| 0–5% | 5% |
| 6–15% | 10% |
| 16–25% | 15% |
| 26% and Above | 20% |

Thus, under this schedule, if plaintiff's annual net revenue goal was $900,000 and she generated $1,000,000 in actual net revenue for the year, then she would have exceeded her goal by $100,000 (11.1%) and her year-end bonus would be $10,000 ($100,000 × 10%).

The 1994/1995 compensation package established an annual net revenue goal of $1,342,000 for plaintiff. That goal was subsequently increased by $207,000. The evidence is conflicting as to exactly *when* plaintiff's revenue goal (a.k.a."quota") was changed. Defendant contends that plaintiff's quota was modified in February 1995, at the approximate mid-point of the fiscal year, after a contract between *Black Enterprise* and GM Mediaworks[3] was signed. (Graves Aff. at ¶ 16).[4] In its Answer to plaintiff's first discovery request, defendant states:

> Under the relevant compensation package, management reserved the right to make final quota assignments and to make goal adjustments. An adjustment was required with respect to Plaintiff's quota so as to protect the integrity and purpose of the commission compensation program.... Due to the activity and effort of others, advertising revenue

from the automotive industry [GM] realized a net increase. Plaintiff was not entitled to enjoy commissions on the net increase in advertising revenue attributed to the activity or effort of other individuals, and thus, an appropriate adjustment was made with respect to Plaintiff's quota so as to avoid an unearned windfall for Plaintiff.[5]

In his affidavit, Earl Graves Jr. avers:

> After I negotiated the new contract with General Motors Mediaworks, plaintiff was informed that it would result in an adjustment in her personal revenue goals and the revenue goal for the entire Chicago office was likewise adjusted.

(Graves Aff. ¶ 16).

Plaintiff insists that her quota was not adjusted in February, 1995. According to plaintiff, her annual net revenue dollar goal was raised retroactively *after* the close of the 1994/1995 fiscal year. At her deposition, plaintiff testified that after the close of the fiscal year and after she had already generated $1,836,987 in net revenue, she was summoned to a meeting in New York with Earl G. Graves, Jr., the Chief Operating Officer of Earl G. Graves

**3.** GM Mediaworks is the agency which sets rates for GM media.

**4.** According to Earl Graves, Jr., the Chief Operating Officer of defendant corporation, the GM Mediaworks account boosted advertising dollars thirty pages.

**5.** Earl G. Graves, Jr. similarly testified at his deposition as follows:

> If I believe that there have been economic trends that are either positive or negative that will impact upon the business, I will adjust the quota. If there is a—and that could be as much as the tobacco industry said that there's going to be no more advertising and, therefore, a person who has a tobacco category will be impacted upon that. I will adjust the quota.... If in fact a

new contract is signed that would increase the overall business that we would receive from a current company or industry, we would adjust the quota upwards. If there was a judgment for a particular company that they were going to spend an additional amount of money in targeted ethnic media, which 'Black Enterprise' would fall under, that was not presumed to be happening in the beginning of the fiscal year or calendar year, that would be a reason. If there was an insert where an insert is a multiple page unit that was not anticipated when the quota was set originally and came in because of, you know, the sales of someone to bring in a quota—not a quota but an increased amount of ad pages that were beyond what was originally anticipated that would be a change.

(Graves Dep. at 71–72).

Publishing, Inc. It was at that meeting when she first learned of her quota adjustment:

> He [Butch Graves] said that he was adjusting my quota because they [defendant Earl G. Graves Publishing, Inc.] did not anticipate me to perform at that level [$1,836,987] and that he could do that and that that's what they were doing. They didn't expect some of the business that came in to come in and that he was adjusting the quota to reflect that. He also told me that I could not benefit from the work that he and his father put into the last 25 years. He said that *Black Enterprise* [m]agazine has been doing business with these companies for over 25 years and you [plaintiff] can't benefit from it and I think we've been more than fair to you.

(Plaintiff Dep. at 106).

Plaintiff contends that the $207,000 increase in quota negatively impacted her year-end bonus by approximately $55,000.[6] Indeed, plaintiff "got upset" upon being informed of the quota increase and concomitant decrease in her year-end bonus.

After the meeting between plaintiff and Butch Graves in New York, plaintiff was paid (by electronic deposit) a year-end bonus based on the increased quota. Thereafter, she began to search for a new job. In August, 1996,[7] at the conclusion of fiscal year 1995–1996,[8] plaintiff resigned from defendant corporation after securing a job with GM.

In September, 1997, approximately one year after resigning from defendant corporation, plaintiff commenced this three-count action. Counts I and II allege breach of contract, and more specifically, breach of the 1994/1995 and 1995/1996 compensation agreements. Count III alleges violations of M.C.L.A. § 600.2961, a provision which provides for damages to "sales representatives" when "principals" intentionally fail to pay commissions when due.

In October, 1997, the parties settled Count II of this lawsuit[9] and on May 6, 1998, this court dismissed Count III. Therefore, the only Count that remains is Count I. Plaintiff is now before the court seeking summary judgment on that count.

## Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

---

**6.** As stated *supra,* the 1994/1995 compensation agreement provided that if plaintiff exceeded her quota by more than 26%, she would be paid a year-end bonus equivalent to 20% of the total amount of net revenue which exceeded her quota, but if she exceeded her quota by 16–25%, she would be paid a year-end bonus equivalent to only 15% of the total amount of net revenue which exceeded her bonus. Therefore, if the $1,342,000 quota set forth in the 1994/1995 compensation agreement is used to calculate plaintiff's year-end bonus, plaintiff, who generated $1,836,987 in revenue for the year, would earn a bonus after all the appropriate adjustments were made, of $98,285. On the other hand, based on the quota $207,000 higher than the quota

contained in the compensation agreement, plaintiff was paid a year-end bonus after adjustments of only $43,735. Therefore, by increasing plaintiff's quota by approximately $200,000, defendant decreased plaintiff's year-end bonus by $54,500.

**7.** Plaintiff testified that she resigned on August 9, 1996, while Earl Graves, Jr. avers that plaintiff resigned on August 6, 1996.

**8.** Plaintiff's quota for 1995/1996 was $1,655,-586 and plaintiff fell $33,244 short of it.

**9.** Defendant paid plaintiff $8,203.99 on October 24, 1997 in settlement of Count II.

(1986). The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *In re Dollar Corp.*, 25 F.3d 1320, 1323 (6th Cir.1994) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat the otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. In deciding a motion for summary judgment, the court must consider all evidence together with all inferences to be drawn therefrom "in a light most favorable to the party opposing the motion." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n., Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980).

■ If the movant meets the standard specified at Rule 56(c), then the opposing party must come forth with "specific facts showing that there is a genuine issue for trial." *First National Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Fed.R.Civ.P. 56(e). The non-moving party "is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). And, "if the adverse party does not respond, summary judgment, if appropriate shall be entered against the adverse party." Fed.R.Civ.P. 56(e); *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *O'Hara v. Wigginton*, 24 F.3d 823, 826–27 (6th Cir.1994).

### Plaintiff's Motion for Summary Judgment on Count I

In Count I, plaintiff alleges that defendant breached the 1994/1995 compensation agreement when it "retroactively" increased her quota by $207,000, thereby decreasing her year-end bonus by approximately $55,000. Specifically, plaintiff argues that the 1994/1995 compensation agreement was an "offer" for a unilateral contract, which she accepted when she undertook efforts to solicit ad revenue during the 1994/1995 fiscal year. Once the offer was accepted, so plaintiff asserts, it became irrevocable and could not be modified or withdrawn absent mutual assent. Plaintiff asserts that she at no time gave her assent to a modification of the terms of the 1994/1995 compensation agreement, and thus when defendant attempted to change the terms of the same (i.e., increase her quota), it breached the contract.

■ The formation of a unilateral contract typically involves a case in which an offer is made by a party which invites acceptance by performance rather than by a promise to perform. *Restatement (Second) of Contracts*, § 45, cmt. a (1979). *See also* A. Farnsworth, *Contracts* § 3.4 (2d ed.1990); 1 Arthur L. Corbin, *Corbin on Contracts* § 70 (1963). Once an offer for a unilateral contract is made, and part of the requested performance has been rendered by the offeree, the offer cannot be unilaterally revoked or modified. *Restatement (Second) of Contracts* §§ 25, 45 & cmt. d (1981); 1 Corbin, *Contracts* § 63 (1952); 1 *Williston on Contracts* (rev. ed.1990), § 5:13, 691–692.

Corbin on Contracts sets forth the following discussion of unilateral contracts with regard to bonus programs offered by employers, which is particularly relevant in this case.

> The same unilateral contract analysis is applicable to the employer's promise to pay a bonus or pension to an employee in case the latter continues to serve for a stated period. It is now recognized that these are not pure gratuities but compensation for services rendered. The employer's promise is not enforceable when made, but the employee can accept

the offer by continuing to serve as requested, even though the employee makes no promise. There is no mutuality of obligation, but there is consideration in the form of service rendered. The employee's one consideration, rendition of services, supports all of the employer's promises, to pay the salary and to pay the bonus. Indeed, although the bonus is not fully earned until the service has continued for the full time, after a substantial part of the service has been rendered the offer of the bonus cannot be withdrawn without a breach of contract.

2 Corbin, *Contracts* § 6.2 (rev. ed.1995).

Michigan courts have applied the theory of "unilateral contracts" in a number of cases involving job benefits. For instance, in *Cain v. Allen Electric & Equipment Co.*, 346 Mich. 568, 78 N.W.2d 296 (1956), the court found that a personnel policy containing a severance pay provision presented an offer for a unilateral contract. The court stated, "[t]he essence of the announcement was precisely that the company would conduct itself in a certain way with the stated objective of achieving fairness, and we would be reluctant to hold under such circumstances that an employee might not reasonably rely on the expression made and conduct himself accordingly." *Id.* at 579, 78 N.W.2d 296. The court further stated:

> In short, the adoption of the described policies by the company [regarding severance pay] constituted an offer of contract. This offer, as the trial court correctly held, 'the plaintiff accepted * * * by continuing in its employment beyond the 5–year period specified in exhibit B (the termination pay policy).' The offer having thus been accepted it was not within defendant's power to withdraw it when called upon to perform. The

'change or amendment' to which the company policy was said, in its preamble, to be subject, could not encompass denial of a contract right gained through acceptance of an offer.

*Id.* at 579–80, 78 N.W.2d 296.

Likewise, in *Gaydos v. White Motor Corp.*, 54 Mich.App. 143, 220 N.W.2d 697 (1974), the Michigan Court of Appeals found a severance pay policy constituted an offer of contract and not a mere gratuity. *Id.* at 148, 220 N.W.2d 697. The court stated that "[a]s the employees continued to work [after the policy was established], consideration was supplied for a unilateral contract, upon which the employees had the right to rely." *Id. See also Clarke v. Brunswick Corp.*, 48 Mich.App. 667, 211 N.W.2d 101 (1973) (holding that a severance pay policy was a unilateral contract); *Couch v. Difco Lab. Inc.*, 44 Mich.App. 44, 205 N.W.2d 24 (1972) (finding that by establishing a profit-sharing plan, defendant-company offered to make certain payments for the benefit of its salaried employees who continued to render their services).

This court finds that, similar to the severance pay policies in *Cain* and *Gaydos*, the 1994/1995 compensation agreement was an offer for a unilateral contract. It was an announcement as to the way the company would conduct itself, and it could be accepted only by the plaintiff's performance. *Cain*, 346 Mich. at 579, 78 N.W.2d 296. The 1994/1995 compensation agreement stated in part:

> This Fiscal Year End Volume Incentive Plan will reward you if you generate net revenue above your annual quota, and will be paid based on an escalating percentage of net revenue above your annual quota. The percentage breakdown is as follows:

| * Above Annual Net Revenue Quota | % Payout |
| --- | --- |
| . . . | |
| 26% and Above | 20% |

Defendant contends that the 1994/1995 compensation agreement was not an offer for a unilateral contract. Defendant contends that unilateral contract theory is inapplicable where there is a subjective element to the performance required to effectuate the offer. There was a subjective element here, so defendant asserts, because it had discretion to assign plaintiff any amount of revenue credit that it desired and that determination affected the amount of plaintiff's year-end incentive award. This court is unpersuaded by defendant's argument for the simple reason that defendant cites absolutely no authority to support it. In fact, authority runs contrary to the argument advanced by the defendants. For instance, Illustration 6 to Section 45 of the Restatement (Second) of Contracts demonstrates that a unilateral contract can arise even if the requested performance is as "subjective" as "caring for" another person:

A writes to her daughter B, living in another state, an offer to leave A's farm to B if B gives up her home and cares for A during A's life, B remaining free to terminate the arrangement at any time. B gives up her home, moves to A's farm, and begins caring for A. A is bound by an option contract.

Having found that an offer for a unilateral contract was made in the 1994/1995 compensation package, the question thus becomes whether defendant could modify it without the mutual assent of both parties after plaintiff began substantially performing under the 1994/1995 compensation package. This court finds that it could not. *Cain* and *Gaydos* make that clear.[10]

### Was the Quota Increase A Modification?

█ The alteration to plaintiff's quota was most certainly a modification. There is no provision in the 1994/1995 compensa-

tion agreement which provides for such a modification.

Defendant contends that the quota adjustment was not a "modification" to the offer contained in the 1994/1995 compensation package regarding plaintiff's volume incentive award. Defendant argues that Paragraph 12 of the 1994/1995 compensation package cloaks it with the authority to unilaterally change plaintiff's quota at any time. That Paragraph states:

Settling disputes on the proper credit of revenue ad pages is the sole responsibility of management.

This court is not persuaded by defendant's argument and finds Paragraph 12 completely irrelevant here. That provision only becomes applicable when a dispute arises regarding the proper amount of revenue ad page credit that should be attributed to a given employee. In this case, there was no such dispute. Defendant credited plaintiff with 159.48 in revenue ad pages ($1,835,987 in ad revenue) for the 1994/1995 fiscal year. *See* Exhibits E and H to plaintiff's renewed motion for summary judgment.

Defendant argues that plaintiff should not have received credit for 159.48 pages since she did not sell all of those pages *herself.* Defendant contends that some of those pages were sold by *others,* such as Earl G. Graves, Jr. Defendant requests that this court allow a jury to assess plaintiff's performance, determine if plaintiff sold 159.48 pages and determine if she should be compensated based on that amount of sales. This court will not allow a trial to proceed on such issues. It is entirely too late for the defendant to argue that plaintiff was not responsible for generating such sales. While the defendant at an earlier time may have had discretion under Paragraph 12 to credit plaintiff with generating less than 159.48 pages ($1,835,987), the fact of the matter is that defen-

---

10. Defendant contends that it could modify the contract any time prior to acceptance, or in other words, any time prior to the end of the fiscal year after plaintiff's total revenue for that year was determined. Yet, this is an erroneous statement of the law. Unilateral contracts cannot be modified once performance is begun.

dant did not exercise that discretion. It is uncontroverted that at the end of fiscal year 1994/1995, the defendant credited plaintiff with selling 159.48 pages and generating $1,835,987 in revenue. Exhibits E and H to plaintiff's renewed motion for summary judgment show this. Moreover, plaintiff earned and was paid monthly commissions based on ad pages totaling 159.48 and revenue totaling $1,835,987. Therefore, the question may be asked, why did defendant credit plaintiff with such sales for purposes of calculating her monthly commissions if plaintiff was not responsible for them? The question answers itself. Certainly, defendant would not have credited plaintiff for the increased General Motors sales activity if she was not responsible for it. In fact, it would have been contrary to the plain language of the 1994/1995 compensation agreement for defendant to do so. The 1994/1995 compensation agreement provides that plaintiff is to be paid a monthly commission based on the actual net revenue dollars *she* generated in that particular month.[10]

In addition to Paragraph 12, defendant relies on *In re Certified Question; Bankey v. Storer Broadcasting Co.*, 432 Mich. 438, 443 N.W.2d 112 (1989), asserting that this provides it authority to unilaterally modify plaintiff's quota at any time. Yet, this court does not find *Storer* on point. In *Storer*, the court held that an employer may unilaterally change a written discharge for cause policy to an employment at-will policy even though the right to make such a change was not expressly reserved at the outset, provided that the employer provides the employee reasonable notice of the change. The court in *Storer* recognized that the case would be altogether different if it involved a benefit "already accrued or 'vested'" such as a

pension and death benefit or severance pay. *Id.* at 457, n. 17, 443 N.W.2d 112. As this court sees it, the case *sub judice* does involve a "vested right." Once plaintiff sold a certain amount of revenue, she expected to be paid a certain amount of incentive. Moreover, *Storer* is distinguishable on another level. The decision in *Storer* was based on the "legitimate expectations" analysis employed in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 292 N.W.2d 880 (1980). This case does not rest on such a doctrine, instead, this case is predicated upon an express agreement, and more specifically a unilateral contract.

Having found that defendant clearly modified the unilateral offer when it changed her quota, the follow up question is whether plaintiff assented to the modification. There is no evidence in the record that plaintiff ever assented to such a modification. Assuming for the sake of argument that plaintiff was presented with her quota change in February 1995, the fact that she remained at the defendant company for over one year after learning of the quota change is not, in this court's eyes, evidence of her assent. *Farrell v. Automobile Club of Michigan*, 187 Mich.App. 220, 228, 466 N.W.2d 298 (1990) (rejecting the argument that acceptance of an offer for a modification to an employment contract can be presumed from the mere fact of continued employment and noting that such an offer could never be rejected absent one leaving employment).

In sum, the 1994/1995 compensation agreement contained a unilateral offer that plaintiff would receive a fiscal year end volume incentive award of 20% of the amount her net revenue exceeded her net revenue quota of $1,342,000. Once plaintiff began substantially performing, that offer could not be modified without plain-

---

10. When asked at the hearing why defendant chose to assign plaintiff with 159.48 pages in ad credit when plaintiff purportedly was not responsible for such sales, defense counsel had no answer. Defense counsel stated that, in hindsight, it should not have increased

plaintiff's quota, but rather it should have given her less credit for sales than it did. As this court sees it, an entirely different question would be before this court if defendant had not increased plaintiff's quota but rather given her less ad revenue credit.

tiff's assent. Here, the uncontroverted evidence is that plaintiff's quota was changed without any assent by her to the same. Thus, as a matter of law this court finds that defendant breached a contract with the plaintiff. Judgment should be entered in favor of the plaintiff for $54,550, the difference between the amount she was paid as a year-end volume incentive award and the amount she should have been paid under the terms of the 1994/1995 compensation package as originally presented to her. Plaintiff is also entitled to interest at the statutory rate.

## ORDER

**IT IS HEREBY ORDERED** that plaintiff's renewed motion for summary judgment on Count I is **GRANTED.**

**IT IS FURTHER ORDERED** that the parties submit a proposed judgment as to all Counts in plaintiff's complaint no later than August 14, 1998.

**SO ORDERED.**

## JUDGMENT

This action came before the court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly reviewed and a decision having been duly rendered.

**IT IS ORDERED AND ADJUDGED** that judgment be entered for the plaintiff Sharon Yvonne Holland on Count I in the amount of $54,500, as well as post-judgment interest calculated in accordance with 28 U.S.C. § 1961.

**IT IS FURTHER ORDERED AND ADJUDGED** that Count II is dismissed with prejudice as it has been settled by the parties.

**IT IS FURTHER ORDERED AND ADJUDGED** that judgment be entered for the defendant Earl G. Graves Publishing Co., Inc. on Count III and that plaintiff takes nothing on this Count.

It is further **ORDERED** that the clerk serve a copy of the judgment by United States mail on the counsel for plaintiffs and on counsel for defendants.