*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

COLLEEN BODNAR, GREG BOZIMOWSKI, CAROL BURKE, GLENDA CALVIN, KEVIN CARDWELL, LESLIE CARDWELL, ANDREA CHELOTTI, JANA CHRUMKA, JOHN CIROCCO, CECILIA DURONIO, SHARON ESGUERRA, MARIANNA FLATT, MARIA GAMBLE, CHERYL ROBB-GENEVICH, KIM GLANDA, BECCA GRAHAM, MARY MARGARET GULOWSKI, ANGELIQUE GWIN, CHRISTYNE ISON, STEVE KISH, HEATHER KWIATKOWSKI, ROBERT LOSEY, KATHLEEN MCNELIS, JESSICA MAST, GREG O'DELL, OSCAR ONG, CHRISTINA POTKAY, KIMBERLY RAFFLER, BRUCE REED, NANCY RICHARDS, KSENIA SCEKIC, SARAH SIMS, CINDY THORNE, KELLY TRETHEWEY, YOLANDA WILKINS, MARIE WILLIAMS, SHEILA WILLIAMSON, KENNETH ANDREW WILLARD, and RUTHANNE WIRTH,

      Plaintiffs-Appellants/Cross-Appellees,

and

TRACY CHASE,

      Plaintiff/Cross-Appellee,

v

ST. JOHN PROVIDENCE, INC. and ASCENSION HEALTH,

      Defendants-Appellees/Cross-Appellants.

FOR PUBLICATION
March 5, 2019
9:00 a.m.

No. 337615
Oakland Circuit Court
LC No. 2016-152330-CB

Before: SHAPIRO, P.J., and SERVITTO and GADOLA, JJ.

GADOLA, J.

Plaintiffs appeal as of right the trial court's opinion and order granting summary disposition in favor of defendants St. John Providence, Inc. (St. John) and Ascension Health (Ascension). Defendants, in turn, cross-appeal the trial court's denial of their motion to strike certain evidence pertaining to proceedings before the Michigan Unemployment Insurance Agency (MUIA). We affirm the trial court's opinion and order in its entirety.

I. FACTS

Plaintiffs are certified registered nurse anesthetists (CRNAs) formerly employed by St. John at hospitals located in Southfield and Novi, Michigan. Ascension is the parent company of St. John. According to plaintiffs' complaint, due to alleged financial losses, defendants elected in late 2014 to outsource St. John's anesthesiology services and began to negotiate the formation of PSJ Anesthesia, P.C. (PSJ), a separate entity providing these services. Plaintiffs allege that in August 2015, defendants contracted with PSJ to transition the employment of St. John's CRNAs directly to PSJ. In October 2015, plaintiffs were notified of the transition plan and of the fact that all CRNAs would cease to be employed by St. John effective December 31, 2015. On or about October 30, 2015, PSJ extended employment offers to the St. John CRNAs, including plaintiffs; however, many of the benefits and premiums to which plaintiffs had been entitled while employed by St. John were either reduced or eliminated.

Plaintiffs declined PSJ's offers of employment on the ground that the offers did not constitute comparable jobs providing commensurate compensation and benefits. Under two employment policies revised and effectuated by St. John in May 2015, the Staff Reduction In Force/Workforce Transition Policy (the RIF Policy) and the Severance Pay and Benefits for Staff (Non-Management) Associates (the Severance Pay Policy), employees who were given notice of position elimination would be required, over a six-month period, to apply for vacant comparable jobs within St. John and would receive priority consideration to interview for such jobs. Eligible employees would be entitled to severance pay and benefits if their positions were eliminated and no comparable jobs were available throughout St. John or Ascension. However, failure to apply or rejection of a comparable job offer would render an employee ineligible to receive severance. "Comparable jobs" were defined as positions within at least 80% of the employee's current pay rate. Under the terms of the policies, plaintiffs maintained that they had not been offered comparable jobs and were therefore entitled to severance pay and benefits, as well as to continued employment and compensation for a six-month period.

Maintaining that plaintiffs had declined PSJ's comparable job offers, defendants refused to pay severance and terminated plaintiffs' employment effective December 31, 2015. Plaintiffs subsequently initiated the present action, advancing claims for breach of contract, promissory estoppel, and statutory and common-law conversion. In lieu of an answer, defendants filed separate motions for summary disposition under MCR 2.116(C)(8) and (C)(10). St. John argued that (1) the RIF Policy and the Severance Pay Policy did not constitute binding contracts in light

of certain disclaimer language; (2) the plaintiffs were not entitled to severance pay under the policies because they refused comparable job offers; (3) the policies did not set forth a clear and definite promise giving rise to a promissory estoppel claim; and (4) plaintiffs had no vested right to severance, thereby undermining any conversion claim. Ascension asserted the same grounds but additionally maintained that it was not a proper party to the litigation, as a corporate parent is generally not liable for the acts of its subsidiary. Defendants also jointly filed a motion to strike from the record certain documents pertaining to unemployment proceedings before the MUIA, arguing they were inadmissible under MCL 421.11.

The trial court granted summary disposition in favor of defendants and dismissed each of plaintiffs' claims. The trial court also denied defendants' motion to strike, given that it accorded those materials no weight in light of their minimal probative value. Plaintiffs now appeal the trial court's opinion and order granting defendants' motions for summary disposition, while defendants appeal the trial court's order denying their motion to strike.

## II. ANALYSIS

### A. STANDARD OF REVIEW

This Court reviews a trial court's ruling on a motion for summary disposition de novo. *Kendzierski v Macomb Co*, 319 Mich App 278, 281; 901 NW2d 111 (2017). Although not clearly specified in the opinion, the trial court appears to have granted summary disposition under MCR 2.116(C)(10), as it determined that plaintiffs failed to raise any material issues of fact. See *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 270; 826 NW2d 519 (2012). On appeal, however, we apply the standard of review applicable under MCR 2.116(C)(8). See *Detroit News, Inc v Policemen & Firemen Retirement Sys of City of Detroit*, 252 Mich App 59, 66; 651 NW2d 127 (2002) ("If summary disposition is granted under one subpart of the court rule when it was actually appropriate under another, the defect is not fatal and does not preclude appellate review as long as the record permits review under the correct subpart." (quotation marks and citation omitted)).

Summary disposition is appropriately granted under MCR 2.116(C)(8) when the opposing party has failed to state a claim upon which relief may be granted. *Dalley v Dykema Gossett, PLLC*, 287 Mich App 296, 304; 788 NW2d 679 (2010). A motion under MCR 2.116(C)(8) tests the legal sufficiency of a complaint on the basis of the pleadings alone. *Id*. All well-pleaded factual allegations are to be accepted as true and are to be construed in the light most favorable to the nonmoving party. *Johnson v Pastoriza*, 491 Mich 417, 435; 818 NW2d 279 (2012). A party may not support a motion under MCR 2.116(C)(8) with documentary evidence such as affidavits or depositions. *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994). However, when an action is premised on a written contract, the contract generally must be attached to the complaint and thus becomes part of the pleadings. *Laurel Woods Apartments v Roumayah*, 274 Mich App 631, 635; 734 NW2d 217 (2007); see also MCR 2.113(F).

B.  BREACH OF CONTRACT

1.  EXISTENCE OF A CONTRACT

Whether a contract exists is a question of law to be determined de novo.  *Kloian v Domino's Pizza, LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006).  Fundamentally, a contract is a promise or set of promises for which the law recognizes a remedy in the event of a breach of those promises.  1 Restatement Contracts, 2d § 1, p 5.  A promise, in turn, is "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."  *Id*. at § 2, p 8.  The elements of a contract include: "parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation."  *Mallory v City of Detroit*, 181 Mich App 121, 127; 449 NW2d 115 (1989).  In order for a contract to be formed, there must be an offer and acceptance, as well as a mutual assent to all essential terms, *Kloian*, 273 Mich App at 452-453, to be judged by an objective standard based on the express words of the parties and not on their subjective state of mind, *Kamalnath v Mercy Memorial Hosp Corp*, 194 Mich App 543, 548; 487 NW2d 499 (1992).

It is well-settled under Michigan law that an employer's statement of policy contained in a manual or handbook can give rise to contractual obligations under certain circumstances.  See *Dumas v Auto Club Ins Ass'n*, 437 Mich 521, 529; 473 NW2d 652 (1991).  In one of the earliest "policy cases" concerning a severance pay policy, *Cain v Allen Electric & Equip Co*, 346 Mich 568, 570-571; 78 NW2d 296 (1956), the employer instituted a "termination pay policy" providing that certain employees with 5 to 10 years of employment would be entitled to two months of pay should their employment be terminated.  Two days after the plaintiff gave notice of his voluntary resignation, the employer terminated his employment, effective immediately. *Id*. at 571.  Applying traditional principles of contract law, the Supreme Court considered the employer's unequivocal announcement that it would conduct itself in a particular manner with respect to severance pay and determined it was not a "mere gratuity" that could be withdrawn but rather amounted to an offer upon which the plaintiff could reasonably rely.  *Id*. at 579.  The Supreme Court further reasoned that the plaintiff accepted the offer by continuing his employment beyond the five-year period specified in the policy.  *Id*. at 580.  Though the policy was subject to change or amendment, the Supreme Court stated that the employer nonetheless could not deny "contract rights gained through acceptance of an offer."  *Id*.

Similarly, in the context of wrongful termination, in *Toussaint v Blue Cross & Blue Shield of Mich*, 408 Mich 579, 597-598; 292 NW2d 880 (1980), the Michigan Supreme Court enforced a provision in an employer's personnel policy manual stating that employees could be discharged "for just cause only."  The plaintiff, who had specifically inquired regarding job security upon his hiring, was told he would have employment "as long as [he] did [his] job" and was given a copy of an employment manual stating the company's just-cause termination policy.  Our Supreme Court held that the just-cause termination policy was enforceable under two theories.  Under the first theory, grounded in contract law, the Supreme Court began its analysis by examining the content of the negotiations and the resulting express agreement.  *Id*. at 612-613.  The court concluded that the plaintiff's testimony that he had specifically negotiated with the employer regarding job security, along with the employer's oral assurances, permitted a rational trier of fact to conclude that those assurances and the policy manual became part of the

plaintiff's express contract of employment. *Id*. Under the second theory, grounded in public policy, the Supreme Court held that an employee's "legitimate expectations" premised on an employer's written policy statements gave rise to enforceable contractual rights. *Id*. at 615.

Our Supreme Court has expressly declined to extend the legitimate expectations theory beyond the context of wrongful discharge and into the arena of compensation policies. *Dumas*, 437 Mich at 529. Although cases such as *Cain* enforced written policy statements as contractual obligations outside the wrongful discharge context, the Supreme Court reasoned that they did so under traditional principles of contract law. *Id*. at 530. The court further noted that if the legitimate expectations theory were to be broadly applied to all domains governed by employment policies, "then each time a policy change took place contract rights would be called into question. The fear of courting litigation would result in a substantial impairment of a company's operations and its ability to formulate policy." *Id*. at 531. Thus, in light of this precedent, any obligations flowing from the policies presently at issue must derive from traditional principles of contract law rather than from plaintiffs' legitimate expectations based on the policies at issue.

In the present case, St. John effectuated both its RIF Policy and its Severance Pay Policy in May 2015. According to the Severance Pay Policy, it superseded any conflicting policies or procedures but was to be "administered in conjunction with [the RIF Policy]. Where differences exist, this policy takes priority for those eligible for coverage." The Severance Pay Policy set forth St. John's general intent to provide severance pay and benefits to associates "when a position is eliminated and a comparable job is not available" through St. John or Ascension, as well as a method for calculating severance pay and benefits.

The RIF Policy outlined the specific procedures to be implemented in the event of a reduction in force, including notification of position elimination and the process for reassignment. Under the RIF Policy, all affected associates were required to apply for vacant "comparable jobs" in order to become eligible for severance pay, and rejection of a comparable job offer would render them ineligible. Affected associates would additionally be entitled to "priority consideration" for vacant comparable jobs for a six-month "placement period" from the date of notification of job elimination. However, the RIF Policy also included the following disclaimer as part of its general "Policy Statement" near the beginning of the document:

> St. John Providence is an "at-will" employer. This means that *no associate has a guarantee of employment for any definite duration of time*. In addition, no associate is guaranteed that they will only be removed from employment if there is just cause for their removal. Any associate may be removed at any time and for any or no reason. *As such, this policy provides guidelines only and does not constitute a contract of any type, or guarantee of continued employment in any position for any duration*. [(Emphasis added).]

The disclaimer language in the RIF Policy plainly conveys St. John's intent not to be contractually bound by either the RIF Policy or the Severance Pay Policy, and thus distinguishes the present case from the outcomes reached in *Cain* and *Toussaint*. Although the Severance Pay Policy did not independently incorporate any disclaimer of contractual intent, it was promulgated along with the RIF Policy and specified that it was to be "administered in conjunction with" the

RIF Policy, except in instances when the two policies conflicted. Because the Severance Pay Policy does not contain any provision that conflicts with the disclaimer in the RIF Policy, the disclaimer applies with equal force to both policies.

Our dissenting colleague contends that the disclaimer is limited in scope to a mere disavowal of a contractual guarantee of just-cause employment rather than a general disclaimer of any contractual guarantees whatsoever. To the contrary, read in context, this provision is contained within a generalized "Policy Statement" setting forth principles governing the entire document. Indeed, other provisions within this section include St. John's overall endeavor to "minimize the impact on associates," to "generally follow the procedures described in this policy," and to establish a Policy Review Committee. A broader interpretation is also supported by the plain language of the disclaimer, which states, "this *policy* provides guidelines only and does not constitute a contract *of any type* . . . ." By its own terms, the disclaimer unambiguously applies to "this policy" rather than to "this provision" and specifies that it does not represent a contract "of any type." To limit the scope would be to nullify this plain language. See *McCoig Materials, LLC v Galui Constr, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012) ("Every word, phrase, and clause in a contract must be given effect, and contract interpretation that would render any part of the contract surplusage or nugatory must be avoided."). The disclaimer therefore disavows the intent that any portion of the policies creates a contractual obligation.

Though not binding in the compensation policy context, wrongful discharge caselaw employing the legitimate expectations analysis has reached the same result when a policy contained a disclaimer. In *Lytle v Malady (On Rehearing)*, 458 Mich 153, 162; 579 NW2d 906 (1998), the plaintiff sought to enforce a provision in an employee handbook stating that no employee would be terminated "without proper cause or reason." The handbook, however, also incorporated a disclaimer stating it was "not intended to establish, and should not be interpreted to constitute any contract . . . ." *Id*. The employer later revised the handbook by including an additional disclaimer reserving the right to terminate employees without assigning cause. *Id*. In applying the legitimate expectations analysis, our Supreme Court held:

> We find this policy is insufficient to overcome the strong presumption of employment at will, particularly where the original handbook also provided that "[t]he contents of this booklet are not intended to establish . . . any contract between . . . [the employer] and any employee, or group of employees." This contractual disclaimer clearly communicated to employees that the employer did not intend to be bound by the policies stated in the handbook. At the very least, we find the disclaimer renders the "proper cause" statement too vague and indefinite to constitute a promise. For this reason, we hold that the "proper cause" provision on which plaintiff relied did not constitute a promise that could form the basis of a legitimate-expectation claim. [*Id*. at 166.]

Thus, the Supreme Court held that the employer made no promise of just-cause employment and that the policy, as written, was not "reasonably capable of instilling a legitimate expectation of

just-cause employment." *Id*. at 166.[1]   Accord *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405; 550 NW2d 243 (1996) (holding that no enforceable rights are created when a handbook contains a disclaimer stating its provisions are not intended to be construed as a contract).

Finally, to the extent that plaintiffs interpret *Cain* as holding that an employee's acceptance of an offer made by an employer may not be defeated by reference to a disclaimer in a general personnel policy or handbook, this argument is unavailing.   The "disclaimer" referenced in *Cain* was a personnel policy providing that its employment policies, including the termination pay policy, were subject to change or amendment.  *Cain*, 346 Mich at 570.  With respect to this provision, the Supreme Court held that the employer's right to change or amend the policy "could not encompass denial of a contract right gained through acceptance of an offer." *Id*. at 580.  That is, the employer could not retroactively modify its policy in order to deny the plaintiff a contractual right to which the employee was already entitled.  Indeed, "a change in a compensation policy which affects vested rights already accrued may give rise to a cause of action in contract." *Dumas*, 437 Mich at 530, citing *In re Certified Question*, 432 Mich 438, 457, n 17; 443 NW2d 112 (1989).  However, those are not the circumstances presented in the instant case.  Here, the disclaimer was contained within the very pair of policies that set forth procedures concerning reduction in force and severance pay.  And unlike *Cain*, the disclaimer presently at issue prevented a contractual offer from ever arising.  Thus, plaintiffs never attained any contract rights.

Because the disclaimer prevented any contractual obligation under either the RIF Policy or the Severance Pay Policy from arising, we affirm the trial court's dismissal of plaintiffs' breach of contract claim.

## 2.  CONTENT OF THE POLICIES

Plaintiffs' breach of contract claim is premised on two theories: that defendants failed to pay plaintiffs severance and benefits and that defendants prematurely terminated plaintiffs' employment and priority consideration for vacant positions before expiration of a six-month placement period.  Even if the RIF Policy and the Severance Pay Policy were contractually binding on defendants, which we conclude they were not, we further hold that the terms of those policies do not entitle plaintiffs either to severance pay or to continued employment or priority consideration during the six-month placement period.

A court's primary obligation when interpreting a contract is to determine the intent of the parties.  *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003).  Intent is discerned from the contractual language as a whole according to its plain and ordinary meaning. *Radenbaugh v Farm Bureau Gen Ins Co*, 240 Mich App 134, 138; 610

---

[1] Independent from its analysis regarding the contractual disclaimer, the Supreme Court also held that the employer had changed its policy to at-will employment and that the plaintiff had actual notice of this change in accordance with *In re Certified Question*, 432 Mich 438, 455-457; 443 NW2d 112 (1989). *Id*. at 168-169.

NW2d 272 (2000). When a contract is clear and unambiguous, the provisions reflect the parties' intent as a matter of law, and courts are to construe and enforce the language as written. *Coates v Bastian Bros, Inc*, 276 Mich App 498, 503; 741 NW2d 539 (2007). A contract is not open to judicial construction unless an ambiguity exists. *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). A contract is ambiguous only when two provisions "irreconcilably conflict with each other" or "when [a term] is equally susceptible to more than a single meaning." *Coates*, 276 Mich at 503 (quotation marks and citations omitted). Whether a contract is ambiguous is a question of law, while determining the meaning of ambiguous contract language becomes a question of fact. *Id*. at 504.

### a. SEVERANCE PAY

The Severance Pay Policy provides that it was intended to provide severance pay and benefits to associates "when a position is eliminated and a comparable job is not available throughout St. John Providence (SJP), Ascension Health or any subsidiary of Ascension Health (AH), or with a transferred owner/employer." Both the Severance Pay Policy and the RIF Policy define a "comparable job" as a "[p]osition within at least 80% of [an] associate's current pay rate and for which they have the ability and qualifications to perform." The RIF Policy further provides that "[a]ny associate who rejects a Comparable job offer will be considered to have voluntarily resigned . . . . [and] will not be eligible for severance or further priority consideration."

In October 2015, PSJ offered plaintiffs positions as CRNAs at the same base rate of pay they had previously earned when employed by St. John. However, the offers reduced or eliminated other terms and benefits of employment, including overtime and other premium rates of pay, contributions to health savings accounts, short- and long-term disability insurance coverage, and life insurance coverage. Because plaintiffs rejected these offers, defendants denied plaintiffs severance pay and benefits, maintaining that under the RIF Policy and Severance Pay Policy plaintiffs were rendered ineligible for severance. By contrast, plaintiffs contend that the positions offered were not "comparable jobs" within 80% of their "current pay rate" because they did not include many of the premiums and benefits plaintiffs had received when employed by St. John. In response, defendants argue that "current pay rate" refers only to employees' base rate of pay and not to those additional fringe benefits and premiums enumerated by plaintiffs. The issue presented thus centers on the policies' use of the phrase "current pay rate."

Although the phrase "current pay rate" is not defined within either of the policies, the fact that a term is left undefined does not render a contract ambiguous. *Vushaj v Farm Bureau Gen Ins Co of Mich*, 284 Mich App 513, 515; 773 NW2d 758 (2009). Rather, as discussed above, courts must construe the contract in accordance with the ordinary meaning of the terms. *Id*. A common understanding of the unqualified phrase "current pay rate" would encompass an employee's then-standing base rate of pay and would not include other premiums or benefits such as overtime pay or disability insurance coverage. The policies do not define a comparable job as one within 80% of an associate's "total compensation package," "current pay rate, including premiums and benefits," or "current pay rate, terms, and conditions." To apply the interpretation advocated by plaintiffs would be to add terms not expressed in the policies' plain language and would effectively rewrite the terms. See *McDonald v Farm Bureau Ins Co*, 480

Mich 191, 199-200; 747 NW2d 811 (2008) ("[I]t has long been the law in this state that courts are not to rewrite the express terms of contracts."); *Northline Excavating, Inc v Livingston Co*, 302 Mich App 621, 628; 839 NW2d 693 (2013) ("We cannot read words into the plain language of a contract.").

Plaintiffs argue that the portion of the Severance Pay Policy setting forth the method of calculating severance uses the phrases "current base hourly rate," "base rate of pay," and "base rate," thus implying that the term "current pay rate" must be distinguished from the concept of base rate of pay. But this argument undermines plaintiffs' position. The Severance Pay Policy's use of the three different iterations of "base rate of pay" demonstrates that the terms are used interchangeably and that there is more than one acceptable way of referring to this non-technical term. Further, an employee's entitlement to severance pay is contingent on receiving no comparable job offers within 80% of the employee's "current pay rate." If the employee receives no such offers, the employee instead receives severance payments in an amount to be determined by reference to the employee's "base hourly rate." It is only logical that these provisions concerning entitlement to severance and the calculation of that severance be interpreted consistently in terms of the employee's pay rate.

On a practical level, applying plaintiffs' interpretation of "current pay rate" would prove virtually impossible. Were premiums and fringe benefits to be included in the calculation of an employee's "current pay rate," that figure would fluctuate constantly, depending, for example, on the number of overtime or premium hours that an employee worked within a given pay period. As a result of this constant fluctuation, the policies would necessarily have to define what point in time is "current" for purposes of the calculation, whether it be the last day of a bi-weekly pay period or a yearly or monthly average. Additionally, under such a measure, it would become necessary to make separate calculations for each employee, taking into consideration the amount of overtime each had worked, the amount of reimbursements each had received, and the fringe benefits in which each had enrolled. It would be further necessary to quantify the value of certain fringe benefits such as medical expense accounts or life insurance buy-up coverage. Had St. John intended the calculation of "current pay rate" to include premiums and benefits, it surely would have made that intention clear and provided a method in the policies for resolving these resulting complications. Because courts avoid interpreting contracts in a manner that would impose unreasonable conditions or absurd results, *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 297; 778 NW2d 275 (2009), we decline to adopt the interpretation advanced by plaintiffs.[2]

---

[2] Although the dissent notes that summary disposition would be premature given the lack of discovery into the difficulties of computation, no amount of discovery could rebut the unreasonable complications that would ensue from applying plaintiffs' interpretation. See *Oliver v Smith*, 269 Mich App 560, 567; 715 NW2d 314 (2006) (summary disposition is appropriate if there is no reasonable chance that further discovery will reveal factual support for the opposing party's position).

Accordingly, the plain language of the policies clearly and unambiguously provides that a comparable job is defined by reference to an employee's base rate of pay and not to any additional benefits, premiums, terms, or conditions. Because plaintiffs rejected offers of employment within 80% of their current base rates of pay, defendants thereafter denied them severance pay and benefits in accordance with the policies. The trial court therefore properly dismissed plaintiffs' breach of contract claim premised on defendants' failure to pay severance.[3]

### b. PLACEMENT PERIOD

Plaintiffs additionally assert they were contractually entitled under the policies to receive continued employment, compensation, and priority consideration for vacant positions throughout the six-month placement period. They claim defendants breached this obligation when they prematurely terminated plaintiffs' employment before the six-month period had elapsed. Although the trial court did not reach the merits of this breach of contract theory beyond holding that no contract existed, the claim may nevertheless be reviewed on appeal. See *Loutts v Loutts*, 298 Mich App 21, 23-24; 826 NW2d 152 (2012) (holding that a claim raised before the trial court and pursued on appeal is preserved for appellate review).

With respect to the procedures governing a reduction in force, the RIF Policy provides that, for a six-month "placement period" beginning on the date an associate is notified of job elimination, that associate "will be given priority consideration for interviews for vacant positions for which they are qualified." The RIF Policy further states,

> 1. During the placement period, affected associates will be required to apply for available Comparable Jobs within [St. John] for which they qualify or they will be ineligible for severance. . . . *Employment will end for those associates unable to be placed in any job within [St. John] on their job elimination date.*
>
> 2. Affected Associates on [St. John]'s position elimination list will receive priority consideration to interview for approved vacant, Comparable Jobs within [St. John] for up to six months (including the notification period). . . .
>
> * * *
>
> 5. *Any associate who rejects a Comparable job offer* will be considered to have voluntarily resigned effective two weeks from the date of the rejection of the

---

[3] Although we affirm the trial court's conclusion that plaintiffs are not entitled to severance pay under the policies, we find no merit in its rationale that plaintiffs presented no evidence that they signed a Confidential Severance, Waiver and General Release Agreement as required under the policies. There is no evidence that plaintiffs were ever presented with the release agreement, and plaintiffs likely would have received the agreement for signature only after they had been determined eligible for severance pay and benefits. However, "[a] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Mich Dept of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003).

offer or on the last day of the notification period, whichever is earlier. Such associates *will not be eligible for severance or further priority consideration.*

6. Associates who reject an offer that is not Comparable will continue in the placement period and will remain eligible for priority consideration and/or severance. [(Emphasis added).]

Though the RIF Policy states that, during the six-month placement period, affected associates would be granted priority consideration to *interview* for vacant positions in a comparable job, nothing within the terms can be construed as an offer of continued employment during this period. Indeed, the RIF Policy expressly states that employment was at-will, that associates could be "removed at any time and for any or no reason," and that the policy was not to be construed as a "guarantee of continued employment in any position for any duration." It is possible that the six-month placement period could extend priority consideration to associates even after their employment ended. However, the policy clearly states that employment would end on the job elimination date for associates who had been unable to find alternate placement. Finally, because plaintiffs rejected comparable job offers, they became ineligible for continued priority consideration.

Thus, the terms of the RIF Policy do not support plaintiffs' claims that they were entitled to continued employment, compensation, or priority consideration, and the trial court's dismissal of plaintiffs' breach of contract claim was appropriate.

## C. PROMISSORY ESTOPPEL

Plaintiffs' promissory estoppel claim rests on the same bases underlying their breach of contract claim: that defendants failed to pay severance and that defendants prematurely terminated their employment and priority consideration. To successfully assert a claim for promissory estoppel, a plaintiff must establish the following elements: "(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 686-687; 599 NW2d 546 (1999). A promise giving rise to an actionable claim must be "clear and definite," while statements that are "indefinite, equivocal, or not specifically demonstrative of an intention respecting future conduct, cannot serve as the foundation for an actionable reliance." *State Bank of Standish v Curry*, 442 Mich 76, 85-86; 500 NW2d 104 (1993). To determine whether a promise existed, courts must objectively evaluate the circumstances of the transaction, including the parties' words, actions, and relationship. *Novak*, 235 Mich App at 687. The doctrine of promissory estoppel must be cautiously applied "only where the facts are unquestionable and the wrong to be prevented undoubted." *Id*.

Plaintiffs' claim that defendants promised to pay severance and benefits is unavailing for the same reasons the terms of the policies do not support a breach of contract claim. Under the policies, payment of severance was contingent on certain circumstances, namely that an associate's position was eliminated and a comparable job within 80% of the associate's current pay rate was not available. The RIF Policy further stated that an associate would be ineligible

-11-

for severance if he or she rejected a comparable job offer. Consistent with the conclusions reached above, the definition of a "comparable job" set forth in the policies was premised on an employee's base rate of pay and did not include premium pay rates or benefits. Accordingly, because plaintiffs rejected comparable job offers, the policies set forth no promise to pay severance or benefits under the circumstances presently at issue. Nor could plaintiffs have reasonably relied on the policies as extending a promise to pay severance under these circumstances. See *Curry*, 442 Mich at 84 ("[T]he reliance interest protected by [1 Restatement Contracts, 2d, § 90, p 242] is reasonable reliance.").

Likewise, for the reasons discussed above with respect to breach of contract, the terms of the RIF Policy do not support plaintiffs' claim that defendants promised to continue plaintiffs' employment, compensation, or priority consideration for the entire duration of the six-month placement period. With respect to continued employment, the RIF Policy contained a disclaimer expressly stating that the document did not guarantee "continued employment in any position for any duration." While affected associates would receive priority consideration for interviews for six months, the RIF Policy also stated that employment would end for associates who had not yet obtained alternate placement on the job elimination date. Defendants therefore made no promise whatsoever of continued employment. With respect to priority consideration, entitlement is again qualified, as the RIF Policy states that rejection of a comparable job offer renders an associate ineligible for continued priority consideration. Based on the circumstances currently at issue, defendants made no promise of continued employment or of continued priority consideration, nor could plaintiffs have been reasonably justified in so relying.

On these grounds, we affirm the trial court's dismissal of plaintiffs' promissory estoppel claim.

### D. CONVERSION CLAIMS

Plaintiffs bring both statutory and common-law conversion claims alleging that defendants wrongfully converted plaintiffs' severance proceeds, employment benefits, and continued compensation for the full duration of the six-month placement period. Conversion is defined under the common law as "any distinct act of dominion wrongfully exerted *over another's personal property* in denial of or inconsistent with his rights therein." *Aroma Wines & Equip, Inc v Columbian Distribution Servs, Inc*, 497 Mich 337, 346; 871 NW2d 136 (2015) (emphasis added). In accordance with the above determinations that defendants had no contractual or equitable obligations either to disburse severance pay and benefits or to continue plaintiffs' employment for any duration, we conclude that plaintiffs had no ownership interest in severance proceeds, benefits, or continued compensation. With no ownership interest in the property sought, plaintiffs' conversion claims must fail. See *Echelon Homes, LLC v Carter Lumber Co*, 261 Mich App 424, 437; 683 NW2d 171 (2004), rev'd in part on other grounds 472 Mich 192 (2005) ("Because the checks do not belong to Echelon, their conversion does not amount to the invasion of one of Echelon's legally protected interests."). The trial court therefore properly dismissed plaintiffs' conversion claims.

### E. CLAIMS AGAINST ASCENSION

Even if plaintiffs' claims had merit, plaintiffs are nevertheless unable to establish liability against Ascension, a defect that could not be cured through further discovery. Plaintiffs allege in their complaint that Ascension is the parent corporation of St. John. Under Michigan law, parent and subsidiary corporations are presumed to be separate and distinct entities absent some abuse of the corporate form. *Seasword v Hilti, Inc*, 449 Mich 542, 547; 537 NW2d 221 (1995). Consequently, before a corporate parent may be held liable for the actions of its subsidiary, facts that justify piercing the corporate veil must be shown. *Id*. at 548. "For the corporate veil to be pierced, the plaintiff must aver facts that show (1) that the corporate entity is a mere instrumentality of another entity or individual, (2) that the corporate entity was used to commit fraud or a wrong, and (3) that, as a result, the plaintiff suffered an unjust injury or loss." *Dutton Partners, LLC v CMS Energy Corp*, 290 Mich App 635, 643; 802 NW2d 717 (2010).

Plaintiffs do not allege in their complaint, let alone plead supporting facts, that St. John is a "mere instrumentality" of Ascension or that the corporate form was somehow abused to commit the wrongs alleged. However, in their brief on appeal, plaintiffs contend that Ascension and St. John are "so intertwined that they appear to be one and the same," citing a September 2016 press release announcing that St. John planned to adopt the Ascension name. Additionally, plaintiffs rely on documents relevant to an unemployment claim pending before the MUIA and identifying as the employer "Ascension Health-IS Inc." and "Ascension Health Insurance, Inc."[4] However, even if such facts had been pleaded, St. John's adoption in 2016 of its parent company's name for the sake of corporate branding is not suggestive that Ascension exerted any influence or control over St. John's RIF Policy or Severance Pay Policy in 2015. Likewise, the MUIA's identification of two Ascension-based entities as the employer in documents generated in 2016 does not demonstrate that Ascension had any role in creating, approving, or administering these policies. To the contrary, affidavits from both Ascension and St. John human resources executives stated that Ascension had no role in the process.

Plaintiffs contend they have not had an opportunity to conduct discovery into the corporate relationship between Ascension and St. John. " 'Generally, a motion for summary disposition is premature if granted before discovery on a disputed issue is complete. However, summary disposition may nevertheless be appropriate if further discovery does not stand a reasonable chance of uncovering factual support for the opposing party's position.' " *Oliver v Smith*, 269 Mich App 560, 567; 715 NW2d 314 (2006), quoting *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 24-25; 672 NW2d 351 (2003). Plaintiffs have not identified any discovery they seek that would demonstrate that St. John was a mere instrumentality of Ascension. Because plaintiffs have neither alleged sufficient facts nor shown any likelihood that

---

[4] On appeal, plaintiffs stipulated to withdraw from evidentiary consideration all documents relating to these unemployment proceedings except for a hearing transcript that is relevant because it contains the testimony of Michelle Kosal, St. John's human resources manager, regarding the meaning of the term "comparable job." This transcript identifies Ascension Health Insurance, Inc., as the employer. However, because plaintiffs concede that the document is relevant only with respect to Ms. Kosal's testimony, we do not consider the fact that it identifies an Ascension-based entity as the employer.

further discovery would yield support for their position, the trial court did not err by dismissing Ascension from the litigation. Thus, we affirm the trial court's opinion granting Ascension's motion for summary disposition.

## F. DEFENDANTS' CROSS-APPEAL

On cross-appeal, defendants contend that the trial court erred in denying their motion to strike five documents submitted by plaintiffs concerning unemployment proceedings before the MUIA. Plaintiffs stipulate to withdraw four of the five documents, leaving at issue only a MUIA hearing transcript containing the testimony of Ms. Kosal.

This Court generally reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *Barnett v Hidalgo*, 478 Mich 151, 159; 732 NW2d 472 (2007). "However, when the trial court's decision to admit evidence involves a preliminary question of law, the issue is reviewed de novo, and admitting evidence that is inadmissible as a matter of law constitutes an abuse of discretion." *Id*. Because the admissibility of the hearing transcript hinges on a question of law, we review this issue de novo.

The Michigan Employment Security Act (MESA), MCL 421.1 *et seq*., prohibits the use of information and determinations elicited during the course of an unemployment proceeding before the MUIA in a subsequent civil proceeding unless the MUIA is a party to or complainant in the action. MCL 421.11(b)(1); *Storey v Meijer, Inc*, 431 Mich 368, 376; 429 NW2d 169 (1988). However, MCL 421.11a sets forth an exception to this rule, providing:

> An individual who testifies voluntarily before another body *concerning representations the individual made to the unemployment agency* pursuant to the administration of this act waives any privilege under section 11 otherwise applying to the individual's representations to the unemployment agency. [(Emphasis added).]

In the present action, it is beyond dispute that Ms. Kosal voluntarily supplied an affidavit concerning St. John's historic interpretation of the terms "comparable job" and "current pay rate" by reference to the base rate of pay only and not to premiums or benefits. This affidavit was submitted before the trial court in support of defendants' motions for summary disposition. The affidavit thus constitutes voluntary testimony submitted before a judicial body.[5]

---

[5] In challenging whether a sworn affidavit submitted before a trial court constitutes testimony before a "body," defendants rely on an unpublished decision of a federal district court concluding that a deposition did not amount to testimony before a "body." See *Ablahad v Cellco Partnership*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued December 13, 2016 (Case No. 15-14009), p 7-8. "Although lower federal court decisions may be persuasive, they are not binding on state courts," *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004), and, as such, we decline to follow this authority.

The parties dispute whether the affidavit concerns representations made by Ms. Kosal to the MUIA in the hearing transcript. The purpose of the hearing before the MUIA was to determine whether plaintiff Kimberly Glanda fraudulently concealed from the agency that she had refused PSJ's offer of suitable work, thereby disqualifying her from receiving unemployment benefits. Part of this inquiry included whether Ms. Glanda had good cause for her refusal of suitable work. The parties disputed during the hearing whether PSJ's offer constituted "suitable work" or a "comparable job," given that the offer reduced or excluded many premiums and benefits.

Ms. Kosal stated during the hearing that Ms. Glanda was offered the same base rate of pay and that a comparable job was defined under the policies by reference to this value and did not take into account premiums and benefits. Ms. Kosal's affidavit submitted before the trial court thus concerned the same representations she made before the MUIA. Consequently, the privilege protecting information presented during a MUIA proceeding was waived under MCL 421.11a, and the trial court properly admitted the MUIA hearing transcript.

Affirmed.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto